1
2
3
4
5
6
7
8                       UNITED STATES DISTRICT COURT

9                     SOUTHERN DISTRICT OF CALIFORNIA

10

11    MARCUS BRICENO,                      Case No.:  3:16-cv-01665-JAH-AGS
      CDCR #AU-0333,
12                                         **ORDER: (1) GRANTING IN PART
                              Plaintiff,   AND DENYING IN PART
13                                         DEFENDANT WILLIAMS' MOTION
      vs.                                  FOR SUMMARY JUDGMENT
14                                         PURSUANT TO
      BLAKE WILLIAMS; CHRIS                Fed. R. Civ. P. 56; AND (2) ISSUING
15    CUMMINGS,                            ORDER TO SHOW CAUSE WHY
                                           DEFENDANT CUMMMINGS
16                            Defendants.  SHOULD NOT BE DISMISSED**

17

18

19                                         **[ECF No. 77]**

20

21          Currently before the Court is a Motion for Summary Judgment filed pursuant to

22    Fed. R. Civ. P. 56 by Defendant Blake Williams ("Williams") (ECF No. 77). After he

23    was notified of the requirements for opposing summary pursuant to *Rand v. Rowland*,

24    154 F.3d 952, 962-63 (9th Cir. 1998) (ECF No. 93), Plaintiff filed his Opposition

25    ("Opp'n") (ECF No. 94). Williams has filed his Reply (ECF No. 95). [1]

26    _____

27    [1] Plaintiff also filed an Opposition prior to the Court's issuance of the *Rand* Order (ECF No. 91) and
      Williams had filed a Reply to this first Opposition (ECF No. 92).  The Court will consider both
28    oppositions and replies in ruling on the pending Motion for Summary Judgment.

While the motion was initially calendared before Magistrate Judge Andrew Schopler, the Court has determined that this Motion for Summary Judgment is suitable for disposition upon the papers without oral argument and that no Report and Recommendation from Magistrate Judge Schopler is necessary.

For the reasons explained, the Court GRANTS in part, and DENIES in part, Williams' Motion for Summary Judgment. (ECF No. 77.)  In addition, the Court issues an Order to Show Cause ("OSC") why Defendant Cummings should not be dismissed for failing to prosecute.

## I.    Procedural Background

On June 27, 2016, Plaintiff filed a Complaint under 42 U.S.C. § 1983 alleging that Williams violated his Fourteenth Amendment[2] rights when he used excessive force against him during his arrest on September 19, 1013.  (*See* ECF No. 1.)  On December 20, 2016, the Court granted Plaintiff leave to proceed in forma pauperis ("IFP"), screened his Complaint pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A, and directed U.S. Marshal service on his behalf. (*See* ECF No. 6.)  Defendant Williams filed an Answer to Plaintiff's Complaint on December 3, 2018.  (*See* ECF No. 35.)  Defendant Cummings has not been served or appeared in this matter.  (*See* ECF No. 30.)

## II.    Plaintiff's Claims[3]

Plaintiff claims Williams stopped Plaintiff on September 13, 2019 and asked him for identification.  (*See* Compl. at 1, 3.)  Plaintiff claims he "offered his  [identification]" but he was "grabbed and pushed, yanked around for no reason at all."  (*Id.* at 3.)  Plaintiff "had his right hand wrapped, stitched up" and his left arm "had stitches and a pick line which is used for medical reasons."  (*Id.*)  Plaintiff alleges Williams "didn't want to understand he was hurting Plaintiff."  (*Id.*)

---

[2] While Plaintiff purportedly brings this action pursuant to the Fourteenth Amendment, his claims are more appropriately analyzed under the Fourth Amendment.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989)

[3] These allegations are those set forth in Plaintiff's Complaint against Williams.

Plaintiff claims that Williams told him he was "able to leave at any time" but when Plaintiff "ran, he chased him." (*Id.*) Plaintiff alleges he "ran for his life" after being "grabbed and yanked around" and "punched by Blake Williams." (*Id.*) Plaintiff alleges he was in "no way a threat to him. (*Id.*)

Plaintiff seeks monetary and punitive damages. (*See id.* at 7.)

## III.   Defendant's Claims

On September 19, 2013, Williams, a San Diego Police Department ("SDPD") Officer, was "driving an assigned marked patrol vehicle in the Encanto area, which is known for its gang violence and high volume of narcotics." (*See* Def.'s P&As in Supp. of Mot. for Summ. J. [hereafter "Def.'s P&As"], ECF No. 77-3 at 3, citing Declaration of Blake Williams [hereafter "Williams Decl."], at ¶ 5.) Williams "noticed a male and female on the west curb line in between a motorhome and truck" on "63rd street, south of Imperial Avenue." (Williams Decl. at ¶ 5.) Williams, "[s]uspecting that there may have been some narcotic transaction occurring," approached the male [later identified as Plaintiff] who "made eye contact" with Williams. (*Id.*) Williams observed Plaintiff "turn[ing] away" and "appear[ing] to be hiding something behind the parked truck." (*Id.*)

Williams was wearing a radio and there is a copy of radio transmissions "relating to the contact with Mr. Briceno which occurred on September 19, 2013." (*Id.*, citing ECF No. 77-5, Ex. 3.) Williams believes the "recording has Mr. Briceno saying, "Dude, I ain't done shit.'" (*Id.*) Williams claims Plaintiff "appeared extremely nervous." (*Id.* at ¶ 6.) Plaintiff told Williams that he was "not a 4th waiver" and he would give Williams his identification card. (*Id.* at ¶ 7.) Williams asked Plaintiff to "stop walking around and to stand on the side of the truck." (*Id.*) Plaintiff "ignored [Williams] commands and started running." (*Id.*)

Williams "started running after the male because [his] investigation was not complete and now his act of running away provided [him] with probable cause his unprovoked flight was now violating California Penal Code Section 148(a)(1) by resisting or delaying [Williams] duty to investigate." (*Id.* at ¶ 8.) Williams "ran after him

while shouting commands for him to 'stop'!"  Williams, while running, attempted to grab Plaintiff "by his sweatshirt with [his] right hand."  (*Id.*)  Plaintiff "slightly turned to the left while continuing to run" which caused Williams to lose his "footing and [fall] to the ground."  (*Id.*)  Williams had injuries to his "left index and ring fingers, as well as scrapes to both of [his] knees as a result of the fall."  (*Id.*)  However, Plaintiff did not stop running.  (*See id.* at ¶ 9.)

Williams "immediately jumped up and again began pursuing him" while giving Plaintiff commands to "stop!" (*Id.* ¶ 10.) Williams  ran across a road, "jumped over a barrier," and continued to pursue Plaintiff across "trolley tracks."  (*Id.*)  Plaintiff "started to slow down" and Williams was able to "grab a hold of him."  (*Id.*)  While Williams was "still holding on" to Plaintiff he "observed that [Plaintiff's] hands were clenched into what appears to be fists." (*Id.*)  "Based on [Williams'] training and experience, it appeared [Plaintiff] was about to fight [him]." (*Id.*)

Because Williams "already had a hold" of Plaintiff with one hand, he "decided to use [his] other hand and to pull him to the ground in a controlled takedown." (*Id.* at ¶ 11.)  Plaintiff "landed on his left side and rolled onto his stomach." (*Id.*)  Williams "placed one knee and one hand on his back to hold him in place." (*Id.*)  He "attempted to move [Plaintiff's] hands away from his waistband area and to place them behind his back." (*Id.*)  Williams gave Plaintiff "commands to stop fighting" and give him his hands but Plaintiff "resisted and refused." (*Id.*)  Plaintiff "started attempting to push himself up with his left hand while his right hand stayed near his waistband." (*Id.*)  Williams feared Plaintiff would pull a gun or knife from his waistband. (*See id.*)  Williams also was aware he was "alone with no cover units, had lost some of [his] equipment, suspected that [his] radio was no longer working and [they] were in a dark area." (*Id.*)

While "continuing to give commands for [Plaintiff] to place his hands behind his back, [Williams] struck him one on the side of his head with a closed fist." (*Id.*)  Plaintiff "immediately removed his right arm from under him and [Williams] was able to gain control of his hands and move them to behind his back." (*Id.*)  While "securing the

handcuffs, [Plaintiff] began yelling obscenities at [Williams] and asking why [Williams] punched him." (*Id.*) Williams "explained that he was reaching for his waistband and was not complying with [his] orders." (*Id.*) Williams declares that "[a]t no point did [Plaintiff] lose consciousness, tell [Williams] that he had a port or complain of any injuries as he now claims." (*Id.*)

Later, Plaintiff "started complaining that he felt weird and was having trouble breathing." (*Id.* at ¶ 16.) Another officer called paramedics "approximately eight minutes after [Williams] initial contact with [Plaintiff]." (*Id.*) Paramedics did arrive but Williams "did not observe their interaction" with Plaintiff. (*Id.* at ¶ 17.)

Williams was transported to a hospital where it was noted that the "nail had come off of [his] left index finger," his "pants had ripped at both knees," and he was diagnosed with "abrasions on [his] hands and knees, and a sprained finger in [his] right hand." (*Id.* at ¶ 18.)

Williams was later "informed that while at the hospital, medical staff found a knife hidden in [Plaintiff's] waistband." (*Id.* at ¶ 19.) Plaintiff was later "taken from the hospital to Headquarters for processing and then booked into County Jail with charges of resisting arrest causing injury" and for his "active parole warrant." (*Id.*)

## IV.   Defendant's Motion for Summary Judgment

### A.   Standard of Review

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

As the moving party, Defendant "initially bears the burden of proving the absence of a genuine issue of material fact." *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation)*, 627 F.3d 376, 387 (9th Cir. 2010) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). He may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B).

While Plaintiff bears the burden of proof at trial, Defendant "need only prove that there is an absence of evidence to support [Plaintiff's] case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied." *Id.* at 323.

If Defendant as the moving party meets his initial responsibility, the burden then shifts to Plaintiff to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the allegations or denials of his pleadings, but is instead required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, to support his contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A [p]laintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).

Plaintiff must also demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of his suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for him. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

Finally, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and ... avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, if Plaintiff "fails to properly support an assertion of fact or fails to properly address [Defendant's] assertion of fact, as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ...." Fed. R. Civ. P. 56(e)(2). Nor may the Court permit Plaintiff, as the opposing party, to rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). A "motion for summary judgment may not be defeated ... by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249-50 (1986); *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006); *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("'[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.'") (quoting *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996)) (brackets in original)).

B.   Evidentiary Objections

In support of his Motion, Williams has submitted a "copy of the SDPD radio transmissions relating to Officer Williams' September 19, 2013 contact with Plaintiff." (Tejura Decl., ECF No. 77-2; Ex. 3, ECF No. 77-5.)  In his moving papers, Williams uses this recording to assert that it was only fifteen (15) seconds between the time he first got out of his patrol car to the time Plaintiff "ignored Officer Williams' commands and started running north on 63rd street." (*See* Def.'s Mem. of P&As in Supp. of Mot. for Summ. J., ["P&As"], ECF No. 77-1 at 19.)

Williams states in his declaration that he has listened to this recording and he "recogniz[ed] his voice as saying, "I'm out with one at about 6-3 and Imperial" followed by Plaintiff purportedly saying "Dude, I ain't done shit." (Williams Decl. at ¶ 6.) Williams further attests that he could then be heard to say "he's running" which is "approximately 15 seconds after [his] initial radio call." (*Id.* at ¶ 8.)

Plaintiff objects to this recording arguing that it is "falsified" and been "tampered with" as it is highly unlikely that that entire exchange between Plaintiff and Williams occurred within a fifteen (15) second timeframe. (Pl.'s Opp'n, ECF No. 91, at 2.) Under Federal Rule of Evidence 901, "[a]uthentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what it proponent claims.'" *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002) (quoting Fed. R. Evid. 901(a).)

In response, Seetal Tejura, counsel for Williams, claims to not have "altered or tampered with the recording of the San Diego Police Department's radio transmissions." (Tejura Decl. at ¶ 2.) "Upon information and belief, the SDPD records attached to the motion for summary judgment were obtained from the District Attorney's Office." (*Id.* at ¶ 3.) Williams also submits the declaration for the custodian of records for the SDPD Communications Division, certifying that the "records sent to you on November 21, 2013 in *Briceno v. Williams*" are a "true and correct copy." (*See* Tejura Decl., Ex. 18, Decl. of Cindi Hardison.") This does not clarify the authentication of this recording nor does it identify the documents or recordings that the records that were originally sent to the San Diego District Attorney's Office.

Williams also submits the declaration of Brooke E. Tafreshi, custodian of records for the Office of the San Diego County District Attorney but this declaration also fails to provide clarity on the authentication of this recording. (*See id*, Decl. of Brooke E. Tafreshi.) Tafreshi declares that "enclosed records are true copes of discoverable District Attorney records described in the deposition subpoena for business records issued in the above captioned case." (*Id.* at ¶ 4.) There is no description or confirmation that this

recording was part of the records submitted.  In addition, Tafreshi declares that "[a]ll other records provided under this subpoena that were not created by the San Diego District Attorney's Office, are records that exist in our file but for which we cannot provide certification within the meaning of the Federal Rules of Evidence."  (*Id.* at ¶ 6.)

While the Court makes no finding that there was any intentional alteration or tampering with this recording, there is admissible evidence that this recording is not an accurate reflection of the entire interaction between Plaintiff and Williams before Plaintiff began to run.  This is relevant in that Williams, at the very least, implied that the recording was evidence that Plaintiff had run from him within fifteen (15) seconds of their initial encounter.  However, it is clear when that timeframe was challenged, Williams now states that "the *amount of time* that it took for Plaintiff to ignore the commands and flee is not a material fact."  (Reply, ECF No. 92 at 4) (emphasis in original.)  In addition, there is testimony from both parties regarding verbal exchanges between them that are not on this recording and it is undisputed this verbal exchange took place before Plaintiff began to run.  However, the verbal exchange testified to by both parties is not heard on this tape.

Defendant initially introduced this evidence on a compact disc with what appears to be the logo for the City of San Diego as an exhibit to Tejura's Declaration as "Exhibit 3" in support of the Defendant's Motion.  (*See* Tejura Decl., Ex. 3.)  The only description on the compact disc is "S.D.P.D. audio recording." (*Id.*)  Tejura's declaration indicates that the "foregoing is true and correct" with regard to the submission of all the exhibits.  (Tejura Decl. at 4.)  However, this is insufficient to authenticate the recording.  In *Orr*, the Ninth Circuit held that a declaration from counsel that an exhibit is "true and correct" cannot authenticate the exhibit if counsel lacks personal knowledge.  *Orr*, 285 F.3d at 777.

Thus, for all the above stated reasons, the Court finds that this recording has not been properly authenticated pursuant to Federal Rules of Evidence 901(a) and sustains Plaintiff's objection.

1    C.    Defendant's Arguments

2         Williams seeks summary judgment as to Plaintiff's Fourth Amendment excessive

3    force claim against him arguing he is entitled to qualified immunity. (*See* Def.'s Mem. of

4    P&As at 9-20.)

5    D.    Qualified Immunity

6         "Government officials enjoy qualified immunity from civil damages unless their

7    conduct violates 'clearly established statutory or constitutional rights of which a

8    reasonable person would have known.'" *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir.

9    2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When presented with a

10   qualified immunity defense, the central questions for the court are:  (1) whether the facts

11   alleged, taken in the light most favorable to Plaintiff, demonstrate that the Defendant's

12   conduct violated a statutory or constitutional right;  and (2) whether the right at issue was

13   "clearly established" at the time it is alleged to have been violated.   *Saucier v. Katz*, 533

14   U.S. 194, 201 (2001).  Although *Saucier* originally required the Court to answer these

15   questions in order, the U.S. Supreme Court has since held that "while the sequence set

16   forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory."

17   *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

18        If the Court finds that Plaintiff's allegations do not make out a statutory or

19   constitutional violation, "there is no necessity for further inquiries concerning qualified

20   immunity." *Saucier*, 533 U.S. at 201.  Similarly, if the Court determines that the right at

21   issue was not clearly established at the time of the defendant's alleged misconduct, the

22   court may end further inquiries concerning qualified immunity without determining

23   whether the allegations in fact make out a statutory or constitutional violation.  *Pearson*,

24   555 U.S. at 236-37.

25   E.    Fourth Amendment Excessive Force

26        "Police use of force is excessive and violates the Fourth Amendment if it's

27   objectively unreasonable under the circumstances." *Zion v. Cty of Orange*, 874 F.3d

28   1072, 1075 (9th Cir. 2017); *Graham*, 490 U.S. at 388; *Scott v. Harris*, 550 U.S. 372, 383

10

(2007). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.

### 1. Nature and Quality of the Intrusion

The Court must first consider the "quantum of force used" to arrest Plaintiff "by considering 'the type and amount of force inflicted.'" *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (citation omitted.) Here, Williams attests that when he got a "hold of [Plaintiff] with one hand, [Williams] decided to use [his] other hand to pull him to the ground in a controlled takedown." (Williams Decl. at ¶ 11.) While Plaintiff was lying on his stomach, with his knee on his back, he "struck [Plaintiff] once on the side of his head with a closed fist." (*Id.* at ¶ 11.) Plaintiff testified in his deposition that Williams "grabbed [him] from the back of [his] neck, slammed [him[ on the floor, started punching [him], kneeing [him]." (Pl.'s Depo at 40:3-5.) Plaintiff further testified that he believed he was struck "three to five times" by Williams with a closed fist. (*Id.* at 23:10.) Plaintiff also believes he "blacked out." (*Id.* at 44:17-18.)

Williams argues that "the use of physical force to control and handcuff Plaintiff was reasonable given his sudden, active, physical moves" and he "used 'measured and ascending' actions that corresponded to Plaintiff's escalating physical resistance in order to gain his compliance." (Def.'s P&As at 19.) Williams claims Plaintiff's "hands were clenched into what appeared to be fists" and "planted his feet in what appeared to be a fighter's stance" immediately before he grabbed Plaintiff and took him to the ground. (Williams Decl. at ¶ 10.) Williams claims that Plaintiff's behavior is defined by "SDPD procedure 1.04 as 'Assaultive Behavior.'" (*Id.*) Thus, in response to this "assaultive behavior" Williams "used a take-down procedure to be able to keep Plaintiff from running again, to keep him from fighting, and to place him into handcuffs." (Def.'s P&As at 20.)

Williams also argues that Plaintiff's action constituted "Active Resistance" which is defined by SDPD procedure as "behavior that consists of a refusal to comply with verbal commands and conveys a threat to the officer or another person, or consists of physical opposition to attempts of control by the officer." (Def.'s P&As at 20.) In support of his position that the force he used was reasonable, Williams submits the declaration of Debbie Eglin, a "31-year law enforcement veteran with the San Diego County Sheriff's Department and the San Diego County Marshal." (*Id.*, ECF No. 77-17, Ex. 15, Declaration of Debbie Eglin [hereafter Eglin Decl.] at ¶ 1.) Eglin opines that Williams "used reasonable force in self-defense, to overcome active resistance and to stop the assaultive behavior" and "pursuant to standard police policies, there does not appear to be any violation of policy, procedure or training by Officer Williams." (Eglin Decl. at ¶ 19.)

SDPD procedure defines "Defending Force" as the "force needed to stop assaultive behavior against an officer or another person." (Def.'s P&As at 15, Ex. 12 at 48.) It also states that this "level of force generally involves impact strikes by an officer" which can be "delivered either by personal body weapons (e.g., hands, fee, knees, etc.) or impact weapons." (*Id.*)

Plaintiff testified in his deposition that he was "trying to avoid [Williams] grabbing [him] or hurting [him]" and when he "slowed down" he was "slammed" onto the floor by Williams. (Pl.'s Depo at 40:1-4.) This testimony contradicts Williams declaration that Plaintiff was in a "fighting stance" when Williams used force against Plaintiff to take Plaintiff to the ground. There is also a dispute as to whether Williams could reasonably believe that Plaintiff was reaching for a weapon necessitating his use of force in punching Plaintiff in the head. The "factors articulated in *Graham,* and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).)

There is no dispute that Williams caused Plaintiff to be taken to the ground and he punched him in the head with a closed fist at least one time.  Plaintiff claims he was punched in the head several times.  Delivering a blow to the head can cause a "substantial risk of death or serious bodily injury."  *Bryan v. MacPherson*, 630 F.3d 805, 825 n. 6 (9th Cir. 2010).  Here, the Court finds that the undisputed facts demonstrate that the use of force in this matter was severe.  Thus, viewing the facts in the light most favorable to Plaintiff, a jury could find that Williams used force that caused Plaintiff serious bodily injury.

2.      Governmental Interests

The Ninth Circuit "assess[es] reasonableness using the non-exhaustive *Graham* factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Zion*, 874 F.3d at 1075 (quoting *Graham*, 490 U.S. at 396).  "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  *Smith*, 394 F.3d at 701 (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir 2002).)

a.      Severity of the crime

Williams claims he "approached Plaintiff and the female that he was with because he had a duty to investigate what appeared to be suspicious activity occurring in between two cars and with Plaintiff holding what appeared to be an open alcohol container." (Def.'s P&As at 19 citing Williams Decl. at ¶ 5.)  Williams declares "San Diego had a municipal code that states that it was unlawful to consume any alcoholic beverage on public property (with a few exceptions that did not appear to apply here)." (Williams Decl. at ¶ 5.)  Williams does not indicate what the penalty is for violating this municipal code and does not set forth any facts to suggest that this is a serious crime. *See Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) ("[A] particular use of force would be

more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor.")

However, in his testimony at Plaintiff's preliminary hearing, Williams testified that he initially saw "some type of narcotic transaction or something narcotic going on" when he first saw Plaintiff.  (Pl.'s Opp'n, ECF No. 91, at 37.)  Williams also testified that when he made "eye contact" with Plaintiff, Plaintiff "turned away from the female, went to the west curb line, and appeared to be hiding from [Williams] behind the truck that was there."  (*Id.*)  Williams "didn't know if [Plaintiff] was hiding something or trying to retrieve something he could be concealing narcotics or also retrieving a weapon or hiding a weapon of some sort."  (*Id.*)  Williams later admits that when he first saw Plaintiff that he "couldn't really see his hands and it was extremely dark at that time, so no, [Williams] didn't really even see his hands at that time."  (*Id.* at 54.)  Williams further acknowledges that he "didn't see [Plaintiff] with the alcoholic beverage."  (*Id.* at 57.)  As stated above, in his moving papers, Williams argues that Plaintiff was "holding what appeared to be an open alcohol container" but this is not his testimony in the preliminary hearing or in the declaration he filed in support of his motion.

Plaintiff claims, and Williams confirms, that when he was approached by Williams he offered to show Williams his identification.  (*See* Comp. at 3; Williams Decl. at ¶ 7.)  In his deposition testimony, Plaintiff testified that he "tried to offer [Williams] my ID" but Williams "kept telling him I don't want your ID."  (Def.'s P&As, Ex. 14, Pl.'s Depo at 29:13-18.)  Williams does not dispute this testimony.

The severity of the crime at issue, the open alcohol container purported violation and Plaintiff leaving the scene before the investigation was completed, does not weigh in Williams' favor.  At the time Williams used force on Plaintiff, the offense of having an open container of alcohol alone is not severe for the purposes of this analysis.  *See Smith*, 394 F.3d at 702 (Finding that the "circumstances are not such in this case to warrant the conclusion that [plaintiff] was a particularly dangerous criminal or that his offense was especially egregious.")  Moreover, Williams declared that he had "never met Marcus

Briceno prior to September 19, 2013" to the "best of his recollection" and thus, he had no knowledge that Plaintiff was a suspect for any other criminal activity at the time he stopped him. (Williams Decl. at ¶ 2.) Williams offers no testimony or evidence that he was aware that Plaintiff had an outstanding warrant during the events giving rise to this matter.

> b.  Immediate threat to the safety of officers or others

Of all the factors to be considered, "the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

Williams attests that when he was finally able to "grab a hold" of Plaintiff, Plaintiff "turned around towards [him]" at which time Williams observes Plaintiff's hands were "clenched into what appeared to be fists." (Williams Decl. at ¶ 10.) Williams further attests that Plaintiff's "fists were near his chest and he planted his feet in what appeared to be a fighter's stance." (*Id.*) Williams believed that, based on his "experience and training," Plaintiff was about to fight him which is interpreted as "assaultive behavior" as defined by "SDPD procedure." (*Id.*) Williams "pull[ed] [Plaintiff] to the ground in a controlled takedown." (*Id.* at ¶ 11.) Plaintiff "landed on his left side and rolled onto his stomach." (*Id.*) Williams declares that Plaintiff "resisted and refused" to put his hands behind his back. (*Id.*) Plaintiff's right hand was "near his waistband" and Williams declares to have had "several prior instances where suspects have pulled guns and knives from their waistbands." (*Id.*) However, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

Plaintiff testified that Williams "slammed [him] on the ground" and he "landed" on his stomach. (Pl.'s Depo at 43:2-8.) Plaintiff fell "face-first to the floor" and was trying to "protect [his] hands at the same time." (*Id.* at 43:12-14.) Plaintiff further testified that Williams said nothing to him as he "started punching" Plaintiff. (*Id.* at 43:15-16.)

Plaintiff also claims in his verified Complaint that he had stitches in his right hand and a "pick" line in his left arm.  (Compl. at 3.)  Thus, there is a material issue of disputed fact as to whether Williams gave Plaintiff any commands before striking him in the head.

It is undisputed that Plaintiff had a knife in his possession at the time of the incident.  Plaintiff describes this knife as a "beer bottle opener, a little like a key chain little knife."  (Pl.'s Depo at 24:23-25.) However, Williams did not discover this knife after he gained control of Plaintiff nor does he allege that he searched Plaintiff for weapons after Plaintiff was handcuffed.  In addition, there is no evidence in the record that the responding officers, Defendant Chris Cummings and Officer Sarah Sutter, searched Plaintiff for weapons before transporting him to the hospital.  Instead, "[w]hile the hospital staff were assessing Mr. Briceno for injuries, a small knife was located in his waistband."  (Def.'s P&As, Ex. 13, Declaration of Sarah Sutter [hereafter Sutter Decl.] at ¶ 8.)   The fact that the record is devoid of evidence that Plaintiff was searched for weapons after he was placed in handcuffs and transported to the hospital does not lend support to Williams claim that he feared Plaintiff had a weapon when he struck him in the head.

Viewing the evidence in light most favorable to Plaintiff, a reasonable jury could find that Plaintiff did not pose an "immediate threat" to Williams' safety or others.

c.     Resisting or evading arrest

Here, the evidence in the record, while viewing it in the light most favorable to the Plaintiff, it is undisputed that Plaintiff actively evaded arrest when he ran from Williams. Plaintiff admits in his deposition that Williams was giving him "commands" while he ran away from Williams but nonetheless, he continued to run.  (Pl.'s Depo at 40:18-19.) However, there are disputed facts as to whether Plaintiff was actively resisting arrest after Williams took Plaintiff to the ground.  The record before the Court does not set forth undisputed evidence that Williams gave Plaintiff sufficient time to respond to his commands before punching Plaintiff in the head or that he gave Plaintiff any commands at all before punching him in the head with a closed fist.

A jury could find that Plaintiff's purported resistance after he was taken to the ground "was not 'particularly bellicose'" and was not sufficient to justify the force used by Williams against Plaintiff. *Smith*, 394 F.3d at 703-04 (the plaintiff's resistance, while not completely passive, did not appear to be "particularly bellicose" and thus, a jury could find that the "totality of force" used was unreasonable.)

Based on the evidence in the record before it, and in light of the relevant law, the Court finds that a reasonable jury could find that Williams violated Plaintiff's Fourth Amendment rights. *See Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (finding "inherently fact specific" inquiry of excessive force claims "should only be taken from the jury in rare cases.")

### F.   Clearly Established

As noted above, genuine disputes of material fact exist as to whether Williams violated Plaintiff's Fourth Amendment rights.  If Plaintiff's claims are presumed true, this evidence could establish that Williams used excessive force against Plaintiff. *See Jeffers*, 267 F.3d at 907 (citing *Crawford-El v. Britton,* 523 U.S. 574, 598 (1998)).  Thus, "the next . . . step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.

A right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. However, "the clearly established right must be defined with specificity." *City of Escondido v. Emmons,* __ U.S. __, 139 S.Ct. 500, 503 (2019).  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. __, 138 S.Ct. 1148, 1152 (2018).  "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* at 1152.

1          1.       Take down

2          Williams argues that "[t]here is no case law that would have placed Officer

3    Williams on notice that his take-down of Plaintiff could have been unconstitutional."

4    (Def.'s P&As at 25.)  "Except in the rare case of an 'obvious' instant of constitutional

5    misconduct" the Plaintiff must "identify a case where an officer acting under similar

6    circumstances" was "held to have violated the Fourth Amendment."  *Sharp v. County of*

7    *Orange,* 871 F.3d 901, 911 (9th Cir. 2017) (quoting *White v. Pauly*, __ U.S. __, 136 S.Ct.

8    305, 308 (2015) (per curiam).) In other words, Plaintiff "must point to prior case law that

9    articulates a constitutional rule specific enough" to alert Williams that his "particular

10   conduct was unlawful."  *Id.*  "A case directly on point" is not required "for a right to be

11   clearly established," however, "existing precedent must have placed the statutory or

12   constitutional question beyond debate." *Kisela*, 138 S.Ct. at 1152.

13         In 2016, the Ninth Circuit, in an unpublished decision, found in 2013 a police

14   officer who "executed a hands-on takedown" during the course of an arrest was entitled

15   to qualified immunity because "even assuming the takedown involved an unreasonable

16   application of force, the contours of the law were not sufficiently clear to put any

17   reasonable officer on notice that tackling [plaintiff] would violate the Constitution."

18   *Saetrum v. Vogt*, 673 Fed.Appx. 688 (9th Cir. 2016).  In 2017, the Ninth Circuit, in a

19   published opinion, found there was sufficient evidence to support a jury's finding that an

20   officer who employed a "leg sweep maneuver" to take down the plaintiff during an arrest,

21   even when the plaintiff was "noncompliant," used  excessive force against the plaintiff in

22   violation of their Fourth Amendment rights. *See Shafer v. County of Santa Barbara*, 868

23   F.3d 1110, 1117 (9th Cir 2017).  However, the Ninth Circuit also found that this officer

24   was entitled to qualified immunity because the constitutional violation with regard to a

25   "takedown" during the course of an arrest was not "clearly established."  *Id.*

26         The Court looked to many of the same cases previously examined in *Saetrum* in

27   which the facts indicated that officers had used "comparable degrees of force" but found

28   that none of these cases "involved the challenging environment or an act of physical

resistance or obstruction by the arrestee." *Id.* at 1118 (citing *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003); *Wall v. Cty of Orange*, 364 F.3d 1107, 1111-12 (9th Cir. 2004); *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989); *Blankenhorn v. City of Orange*, 485 F.3d 463, 478-79 (9th Cir. 2007).)  While the Court acknowledged that they "do not require a case to be 'on all fours," they were unable to "identify a case where an officer acting under similar circumstances" was "held to have violated the Fourth Amendment." *Shafer*, 868 F.3d at 1117-18.  In the case before this Court, Williams is alleged to have used excessive force against Plaintiff by using a "takedown" method after Plaintiff actively fled from Williams which is similar to the fact pattern in *Shafer*.   The Court in *Shafer* found in 2017 that there was no case that they were able to identify "where an officer acting under similar circumstances" was "held to have violated the Fourth Amendment." *Id.* at 1117.  Thus, as the actions giving rise to the case before this Court were alleged to have arisen in 2013, the Court finds that Williams is entitled to qualified immunity for this use of force in light of the failure to "identify specific constitutional precedents to alert [Williams] that his particular was unlawful." *Id* at 1118.

### 2.     Punch

The second action by Williams in which he is alleged to have used excessive force is his admission that he hit Plaintiff with a closed fist to Plaintiff's head to gain compliance in order to place him in handcuffs.

As for these set of facts, there is case law that establishes a right to be free from being struck in the head by a police officer in circumstances very similar to the circumstances of this matter.  In *Blankenhorn*, the Ninth Circuit held in 2007 that the act of punching the plaintiff while he was on the ground being handcuffed was unreasonable force even if the plaintiff had been resisting arrest.  *See Blankenhorn*, 485 F.3d at 480.

Williams claims that he was worried Plaintiff was reaching for a weapon, and it was later determined that Plaintiff did carry a knife.  However, Williams purported concern conflicts with the fact that Williams and the other officers who arrived on the scene failed to discover this weapon or even search for any weapon that Plaintiff may

have been carrying.   Moreover, Plaintiff disputes that he was reaching for a weapon and that he was trying to protect further injury to his arms after being thrown to the ground. When there are disputed facts in deciding whether Defendant is entitled to qualified immunity, Williams is only entitled to qualified immunity on the facts as alleged by the non-moving party which is Plaintiff.  *Blankenhorn*, 485 F.3d at 477.

The Court finds that the holding in *Blankenhorn* clearly established to a reasonable officer in 2013 that it is unlawful to punch a suspect while they are being handcuffed if they pose no immediate threat to officers or the public.

Accordingly, viewing the facts regarding the punch or punches to his head after he was taken to the ground by Williams in the light most favorable to Plaintiff, the Court finds Plaintiff has sufficiently produced evidence to satisfy both prongs of the qualified immunity analysis as to this Fourth Amendment excessive force claim.

The Court DENIES Williams' Motion for Summary Judgment as to Plaintiff's Fourth Amendment claims arising from the punch(es) to his head  but GRANTS Williams' Motion for Summary Judgment as to Plaintiff's Fourth Amendment claims arising from Williams takedown of Plaintiff to the ground on the basis of qualified immunity.

G.   <u>Punitive Damages</u>

Williams argues "Plaintiff's punitive damages also fails" as punitive damages are only available under § 1983 when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  (Def.'s P&As at 26) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  The Ninth Circuit has held that this standard does not require actual malicious conduct, but rather, permits punitive damages in instances of reckless or callous indifference to the constitutional rights of a defendant.  *See Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).

Factual issues remain as to whether Williams used excessive force against Plaintiff and thus, factual issues remain as to whether Williams' conduct rose to the level of

"reckless or callous indifference." *Id.* Thus, the Court DENIES Williams' Motion for Summary Judgment on the issue of punitive damages.

**V.     Conclusion and Order**

In light of the above, the Court:

(1)  **GRANTS** in part, and **DENIES** in part,  Defendant William's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (ECF No. 77.)

It is further Ordered that:

(2)  Plaintiff must show cause no later than **forty-five (45) days from the date of this Order** why the claims against Defendant Cummings should not be dismissed for want of prosecution pursuant to Federal Rule of Civil Procedure 4(m).


**IT IS SO ORDERED**.



Dated: October 15, 2020

_____
Hon. John A. Houston
United States District Judge